## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

EQUAN YUNUS, a/k/a Damon Vincent, a/k/a
Equan Yunas,

Plaintiff,

9:16-CV-1282

v. (GTS/ATB)

DOUGLAS JONES, et al.,

Defendants.

EQUAN YUNUS, Plaintiff, pro se
MARK G. MITCHELL, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge.  Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 44).  Plaintiff responded in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 46-48).  For the reasons set forth below, this court will recommend granting defendants' motion in part and denying defendants' motion in part.

## BACKGROUND

### I.    Procedural History and Facts

#### A.    Procedural History

On October 27, 2016, plaintiff commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that eight employees of the New York State Department of

Correctional and Community Services ("DOCCS") violated his constitutional rights at various times during his confinement at Great Meadow Correctional Facility ("Great Meadow").   On May 12, 2017, the New York State Attorney General's Office filed a motion, pursuant to Fed. R. Civ. P. 12(b)(6), seeking partial dismissal of plaintiff's complaint based on the Eleventh Amendment, statute of limitations, and failure to state a claim upon which relief can be granted.  (Dkt. No. 19).  On August 23, 2017, this court issued a report-recommendation, which was subsequently accepted and adopted in its entirety in a December 1, 2017 decision and order by Chief Judge Suddaby, granting defendants' motion in part and denying defendants' motion in part.  (Dkt. Nos. 22; 26).  The following claims survived defendants' motion to dismiss:

(1)    First Amendment claim against defendant Douglas Jones ("Jones") alleging that he confiscated plaintiff's personal property on November 21, 2013 in retaliation for grievances that plaintiff filed;

(2)    First Amendment claim against defendant Jones alleging that he filed a misbehavior report against plaintiff on November 22, 2013 in retaliation for grievances that plaintiff filed;

(3)    First Amendment claim against defendant Timothy Smith ("Smith") alleging that he performed a strip frisk of plaintiff on December 11, 2013 in retaliation for grievances that plaintiff filed;

(4)    First and Eighth Amendment claims against defendants Kevin Foster ("Foster"), Joshua Alger ("Alger"), Alex Garrido ("Garrido"), and Robert Underwood ("Underwood"), alleging that they sexually assaulted plaintiff on multiple occasions in retaliation for grievances that plaintiff filed.

(Dkt. No. 22 at 30-31).  Discovery with respect to plaintiff's surviving claims was completed as of October 26, 2018.  (Dkt. No. 37).

2

Presently before the court is defendants' motion for summary judgment, pursuant to Fed. R. Civ. P. 56, seeking dismissal of plaintiff's remaining claims in their entirety or, in the alternative, seeking qualified immunity on behalf of the defendants.  (Dkt. No. 44).

### B.    Relevant Facts and Contentions

A detailed summary of plaintiff's allegations was included in my August 23, 2017 report-recommendation.  (Dkt. No. 22 at 2-10).  This court assumes familiarity with that summary and will discuss below specific facts and exhibits necessary to address the defendants' motion for summary judgment.

## DISCUSSION

## II.    Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which

support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III.    <u>Relevant Legal Standards</u>

### A.    **First Amendment – Retaliation**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."

Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

In order to establish a causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller*, No. 98 Civ. 5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001); see also *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *Turner v. Sidorowicz*, 2014 WL 641454, at *10; *Moore v. Cajigas*, No. 12 Civ. 4120, 2013 WL 4734829, at *6 (S.D.N.Y. Aug. 20, 2013). In the context of retaliatory false misbehavior reports, a court may also consider the plaintiff's prior good disciplinary record and whether he was vindicated at the subsequent disciplinary hearing. *Turner v. Sidorowicz*, 2014 WL 641454, at *10–12; *Jones v. Marshall*, No. 08 Civ. 0562, 2010 WL 234990, at *4 (S.D.N.Y. Jan. 19, 2010); *Brown v. Brown*, No. 08–CV–0209 (DNH/GHL), 2010 WL 1186569, at *6 (N.D.N.Y. Jan. 19, 2010); *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).

## B.    Eighth Amendment

### 1.    Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth

Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The Supreme Court has recently re-emphasized that the "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather whether the force was applied in a good faith effort to restore discipline, or whether it was applied maliciously to cause harm, regardless of the seriousness of the injury. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the

mental state of the defendant; the need for the application of force; the correlation

between that need and the amount of force used; the threat reasonably perceived by the

defendants; and any efforts made by the defendants to temper the severity of a forceful

response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003). The extent of the

injury may be considered as one factor in determining whether the use of force could

plausibly have been thought "necessary" in a particular situation. *Wilkins*, 559 U.S. at

40. The extent of the injury may also give some indication of the amount of force

applied and may ultimately be considered in determining damages if appropriate. *Id.*

### 2.    Sexual Assault

"Because sexual abuse of a prisoner by a corrections officer may constitute

serious harm inflicted by an officer with a sufficiently culpable state of mind,

allegations of such abuse are cognizable as Eighth Amendment claims." *Boddie v.*

*Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). "A corrections officer's intentional

contact with an inmate's genitalia or other intimate area, which serves no penological

purpose and is undertaken with the intent to gratify the officer's sexual desire or

humiliate the inmate, violates the Eighth Amendment." *Crawford v. Cuomo*, 796 F.3d

252, 257 (2d Cir. 2015). "[A] single incident of sexual abuse, if sufficiently severe or

serious, may violate an inmate's Eighth Amendment rights no less than repetitive

abusive conduct." *Id.* However, allegations of verbal threats of sexual assault are not

sufficient to state a constitutional violation under 1983. *See Jones v. Rock*, No.

9:12–CV–0447 (NAM/TWD), 2013 WL 4804500, at \*19, n. 10 (N.D.N.Y. Sept. 6,

2013) (finding allegations that the defendant threatened sexual assault, without

7

allegations of actual abuse, failed to state a cognizable claim under 1983).

IV.  **Application**

    **A.    Defendant Jones**

        **1.    First Amendment Claim Alleging Confiscation of Personal Property in Retaliation for Grievances Filed.**

Plaintiff alleges that on November 21, 2013, defendant Jones confiscated his personal property during a cell search in retaliation for the August 15, 2013; October 17, 2013; and November 8, 2013 grievances that plaintiff filed against defendant Jones. Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Johnson v. Eggersdorf*, 8 F. App'x. 140, 144 (2d Cir. 2001); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases). Thus, plaintiff meets the first requirement. Defendants argue, however, that plaintiff cannot satisfy the second and third requirements of a claim for retaliation. Specifically, defendants contend that plaintiff's retaliation claim is not actionable, because the cell search in question was in response to an order by defendant Jones's supervisor. (Dkt. No. 44-16 at 10). Defendants also seek dismissal of this claim based on the *de minimis* value of the alleged confiscated property. (*Id.* at 10-11).

Despite defendants' position, plaintiff raises a triable issue of fact regarding the second prong – whether defendant Jones engaged in an adverse action. An adverse action is any action "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d

8

346, 353 (2d Cir. 2003). "The question of whether a given action is sufficiently adverse to deter someone of 'ordinary firmness from exercising his rights' under the First Amendment is a question of fact." *Sanchez v. Velez*, No. 08-CV-1519, 2009 WL 2252319, at *4 (S.D.N.Y. July 24, 2009); see also *Espinal*, 558 F.3d at 129.

Here, plaintiff testified during his deposition that defendant Jones searched his cell and confiscated important legal research, grievance documents, and personal and religious items. (Dkt. No. 442 at 127-134). "[M]any of the district courts in the Second Circuit have found that cell searches, even if conducted for retaliatory reasons, cannot constitute an adverse action for the purposes of a retaliation claim." *Guillory v. Haywood*, No. 13-CV-01564 (MAD), 2015 WL 268933, at *21 (N.D.N.Y. Jan. 21, 2015). However, "allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search have been deemed sufficient to deter an inmate of ordinary firmness form exercising his constitutional rights." *Id.*; see also *Stewart v. Richardson*, No. 15-CV-9034, 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016) ("Considered collectively, as they ought to be, plaintiff's allegations of retaliatory cell searches and destruction of his property are sufficient to state a claim."); *Smith v. City of New York*, No. 14-CV-5927, 2017 WL 2172318, at *4 (S.D.N.Y. May 16, 2017) ("[T]he confiscation or destruction of property taken at the time of searches may constitute an adverse action" (internal quotation marks omitted)); *Smith v. City of New York*, No. 03-CV-7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005)

9

("[R]etaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action"). Plaintiff's testimony is, thus, sufficient to establish a genuine issue of fact as to whether defendant Jones engaged in any adverse action.

Defendants maintain that the cell search in question was authorized by defendant Jones's supervisor, and as such his "actions regarding plaintiff's cell were not retaliatory and instead were supported by proper, non-retaliatory reasons." (Dkt. No. 44-16 at 10). It is well settled that, "[r]egardless of the presence of retaliatory motive, [ ] a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred. *Quezada v. Roy,* No. 14 Civ. 4056, 2015 WL 5970355, at *20 (S.D.N.Y. Oct. 13, 2015). Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir. 2003)).

Plaintiff has satisfied his initial burden of showing that an improper motive played a substantial part in defendant Jones's alleged actions. Plaintiff's relevant grievances illustrate his documented, continuous complaints about defendant Jones's alleged conduct and verbal harassment toward the plaintiff, including specific threats of retaliation for plaintiff's past grievances. (Dkt No. 1-1 at 82-84, 95-97, Dkt. No. 1-2 at

10

38-41). Plaintiff contends that the grievance documents confiscated from his cell were written about defendant Jones, and it is undisputed that defendant Jones was in plaintiff's cell conducting the search in question. (Dkt. No. 44-2 at 131-32, 135-36). Furthermore, plaintiff maintains that defendant Jones worked in "C Block" at Great Meadow, however plaintiff's cell was in "A Block," "all the way across the [prison]." (*Id.* 138-139). Plaintiff argues that in his experience as an inmate at Great Meadow, it was not "typical" for a corrections officer to conduct a random cell search in another gallery, further illustrating defendant Jones's retaliatory motivation. (*Id.*). Defendants do not address this anomaly in their moving papers.

In response to plaintiff's allegations and in an effort to satisfy their burden with respect to "dual motive," defendants submitted the sworn declaration of defendant Jones. (Dkt. No. 44-10 at 1-3). Defendant Jones avers that it is a part of his job to conduct random cell searches as directed by a supervisor, and he does not decide which cell to search. (*Id.* at 2). Defendant Jones further maintains that he was ordered to conduct a random search of plaintiff's cell on November 21, 2013, as a result of which no contraband was found and no property from plaintiff's cell was confiscated or destroyed. (*Id.*). In support of these contentions, defendants have attached a May 20, 2014 Interdepartmental Communication from a Sergeant Vedder to Acting IGP

Supervisor Waters, which states:[1]

> A review of the block cell search logbook indicates that CO's Weeks and Jones searched the grievants [sic] cell on the date in question. The logbook indicates that there was no contraband found and no damage was done to the cell. The search was random and approved by DSS Quinn.

(*Id*. at 7). The court notes that the Interdepartmental Communication was prepared six months after the cell search, by a DOCCS employee who, as far as this court can discern, had no involvement in the cell search at issue. Furthermore, Sergeant Vedder's blanket assertion that "the search was random and approved by DSS Quinn" is not supported by any further detail.[2] As such, and sharing the concerns stated in cases like *Lewis v. Velez*, 149 F.R.D. 474, 487-88 (S.D.N.Y. May 19,1993) and *Pommer v. Vaughn*, No. 3:07-CV-537, 2009 WL 1490570, at *1-3 (D. Conn. May 27, 2009), that such investigative reports are often prepared after the fact by prison officials concerned about possible disciplinary repercussions and future litigation and often should be inadmissible because of concerns about a lack of trustworthiness, this court cannot conclude, as a matter of law, that defendant Jones's cell search and the alleged confiscation of property

---

[1]Defendants do not clarify why the Interdepartmental Communication was prepared in the first place. Presumably, it was generated as a part of DOCCS's investigation into plaintiff's November 21, 2013 grievance regarding the cell search; however the court notes that it was prepared six months after the fact.

[2]The contraband receipt indicates the name "DSS Quinn" written next to "Supervisor Authorizing Search." (Dkt. No. 44-10 at 5). However, it is not clear, and defendants do not state, whether DSS Quinn actually signed his name or if his name was written on the form by defendant Jones. Furthermore, if it is DSS Quinn's signature, defendants do not confirm whether the signature was placed contemporaneously with the subject cell search, or sometime thereafter.

were supported by a non-retaliatory motivation.[3]

Moreover, defendants' argument that the alleged confiscation of plaintiff's property constituted, at most, a *de minimis* act of retaliation is unavailing, as other courts in this circuit have recognized factually similar situations as actionable. *See Hammock v. Pierce*, No. 15-CV-09052, 2018 WL 2108244, at *7 (S.D.N.Y. May 7, 2018) (plaintiff's testimony as to confiscated legal work and items of religious significance was sufficient to establish a genuine issue of fact as to whether defendants engaged in any adverse action)*; Keesh v. Goord*, No. 04-CV-271A, 2007 WL 2903682, at *8 (W.D.N.Y. Oct. 1, 2007) (denying summary judgment to defendants where plaintiff alleged defendants retaliated against him when they confiscated his typewriter, bowties, religious material and various legal papers); *cf. Zaire v. Coryer,* 204 F. App'x 948, 948 (2006) (concluding that the alleged confiscation of one towel was *de minimis* and insufficient to sustain plaintiff's constitutional claim).

Plaintiff also raises a triable issue of fact regarding the third and final prong of this retaliation claim — causal connection between his protected conduct and the purported adverse action. Significantly, plaintiff need not provide direct evidence of a

---

[3]Defendants cite to my 2011 report-recommendation in *Partak v. Behrle,* in support of their position that a superior officer's order to search an inmate's cell creates a non-retaliatory reason for the officer's actions. (Dkt. No. 44-16 at 10). Nevertheless, in *Partak,* I explicitly qualified my recommendation to dismiss the retaliation claim on plaintiff's failure to make any factual allegation indicating that the defendant officer knew of plaintiff's prior complaints or otherwise harbored a retaliatory motive. No. 9:09-CV-1256 (FJS/ATB), 2011 WL 7629500, at *15 (N.D.N.Y. Sept. 12, 2011). Furthermore, in *Partak* the superior officer's order to search the plaintiff inmate's cell was not disputed.

retaliatory motive to support a retaliation claim. *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003).  As previously discussed, plaintiff has provided sufficient evidence from which a retaliatory motive may be inferred. At his deposition, plaintiff testified that on November 20, 2013, the day before the underlying cell search, defendant Jones threatened to put a weapon in plaintiff's cell in retaliation for previous grievances and lawsuits.[4]  (Dkt. No. 44-2 at 141-142).  Plaintiff's relationship and alleged past encounters with defendant Jones are well documented in his grievance documents. Further relevant to this inquiry is the fact that defendant Jones concedes that no contraband was found as a result of the cell search, despite plaintiff's allegation that his cell was not merely searched, but that defendant Jones "tore the cell up," sprayed something akin to bleach on his bed, and cut the wires to plaintiff's walkman and television; all while plaintiff was in the yard for recreation.[5] (Dkt. No. 44-2 at 136-37). Plaintiff's testimony, coupled with the temporal proximity of the cell search to plaintiff's protected conduct, could support a reasonable inference that defendant Jones harbored a retaliatory motive, and therefore genuine issues of fact remain as to whether the alleged adverse action was motivated by plaintiff's protected conduct.

---

[4]Plaintiff further testified that the day after the cell search, defendant Jones stated to plaintiff: "I am tired of all the grievance writing bullshit," during the false misbehavior report incident, as further discussed below.  (*Id.* at 139).

[5]Defendant Jones concedes that "Whenever possible, inmates should be present when their cells are searched, however it is not required."  (Dkt. No. 44-10 at 2).

## 2. First Amendment Claim Alleging False Misbehavior Report Issued in Retaliation for Grievances Filed.

Plaintiff further alleges that on November 22, 2013, the day after the cell search, defendant Jones issued plaintiff a false misbehavior report in retaliation for prior grievances filed against him.[6]  According to the plaintiff, that morning he was on the stairs, leaving the mess hall with his company after breakfast, when defendant Jones appeared approximately two flights below, escorting a group of inmates to the mess hall. (Dkt. No. 44-2 at 159).  Suddenly, defendant Jones called out to plaintiff saying "you, you, him, right there, come down the stairs." (*Id.* at 161).  Plaintiff complied and descended the stairs, approaching defendant Jones.  (*Id.*).  Defendant Jones told plaintiff to get on the wall, and plaintiff complied.  (*Id.* at 161-62).  Plaintiff was "trying to figure out what was going on," as he was frisked and handcuffed.  (*Id.* at 162-63).  Defendant Jones began "screaming" that plaintiff had threatened his life, causing other correctional officers to respond.  (*Id.* at 164-66).  Plaintiff was thereafter escorted back to his cell. (*Id.* at 167-68).  Plaintiff maintains there were approximately sixty other inmates in the vicinity of the incident, along with other officers escorting plaintiff's company from the mess hall.  (*Id.* at 160).

---

[6]Plaintiff testified that he wrote another grievance against defendant Jones the evening of November 21, 2013, relative to defendant Jones's "malicious" cell search that day. (Dkt. No. 44-2 at 169).  Plaintiff maintains that defendant Jones would have known about the November 21, 2013 grievance first thing the next morning, prior to the false misbehavior report incident on November 22, 2013, as in his experience, officers who picked up the legal mail would immediately alert other officers about grievances filed against them. (*Id.* at 169-70).

Attached to plaintiff's complaint upon initial filing was a December 13, 2013 declaration prepared by inmate Michael Harris. (Dkt. No. 1-1 at 8-9). According to his statement, Harris witnessed the events of that morning. Specifically, Harris states that he was standing in line with plaintiff, atop the mess hall foyer staircase, when a correctional officer called plaintiff from the stairs and had him pat-frisked and handcuffed. (*Id.* at 8). "The officer claimed plaintiff threatened him," but Harris did not see or hear plaintiff do "anything." (*Id.*) However, Harris did see and hear the officer say, "I'm tired of you and your [bullshit] grievances . . . or words very similar." (*Id.*). Harris also claimed to have witnessed "this same officer" search plaintiff's cell "in an unprofessional manner and remove items out of [plaintiff's] cell" the day before. (*Id.*)

Defendant Jones offered a different narrative of the incident. According to the misbehavior report prepared by defendant Jones, he arrived at the stairs leading to the mess hall foyer that morning, and observed plaintiff standing at the top of the stairs. (Dkt. No. 44-10 at 9). Plaintiff was staring at defendant Jones and waving. (*Id.*). Defendant Jones pointed to himself and stated "Me?", to which plaintiff responded, pointing to defendant Jones, "Yes, you wait. I'm going to get you." (*Id.*). Plaintiff then ran his thumb across his throat "as a gesture that [defendant Jones's] throat would be cut." (*Id.*). Defendant Jones proceeded to order plaintiff to the bottom of the stairs, where plaintiff was pat frisked, handcuffed, and escorted back to his cell without further incident. (Dkt. No. 44-10 at 9). Defendant Jones indicated there were approximately

16

forty inmates in the immediate area. (*Id.*).  The misbehavior report was not signed as witnessed by any other correctional officers.  (*Id.*).

After a Tier II Disciplinary Hearing regarding the November 22, 2013 misbehavior report, plaintiff was found guilty of violating Rules 104.11 (Threat of Violence), 107.11 (Inmate Shall Not Harass Employee), and 104.13 (Disturbance).  (Dkt. No. 44-5 at 3). At his deposition, plaintiff testified that, although he requested two witnesses other than defendant Jones at his hearing, one of them being inmate Harris, the hearing officer denied plaintiff's request.  (Dkt. No. 44-2 at 174-75).  The hearing officer imposed a penalty of thirty days keeplock, with corresponding losses of package, commissary, and phone privileges.  (Dkt. No. 44-5 at 3).  The hearing officer's disposition was affirmed on administrative appeal.  (*Id.* at 5).

Plaintiff's grievances against defendant Jones are constitutionally-protected conduct. *See Graham v. Henderson*, 89 F. 3d 75, 80 (2d. Cir. 1996).  As to the second prong, plaintiff's thirty day confinement in keeplock may constitute an adverse action. *See Auleta v. LaFrance*, 233 F. Supp. 2d 396, 402 (N.D.N.Y. Nov. 20, 2002) (" . . . Plaintiff's claim that he was placed in keeplock for 7 ½ days is properly construed as alleging an adverse action.");  *Wells v. Wade*, No. 96 Civ. 1627, 2000 WL 1239085, at *2–4 (S.D.N.Y. Aug. 31, 2000) ("[A] rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing 'keeplock' confinement would be likely to chill a person of ordinary firmness from continuing to

17

engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") (internal quotations omitted).

Regarding causation, defendants contend that plaintiff fails to raise an issue of fact in light of plaintiff's "poor prior disciplinary record" and the Tier II determination upholding the charges set forth in defendant Jones's misbehavior report. (Dkt. No. 44-16 at 12). Plaintiff was incarcerated in the DOCCS system from 2001 through 2016. He received sixteen misbehavior reports between 2003 and 2009, resulting in five Tier III hearings and eleven Tier II hearings. (Dkt No. 44-4 at 2). However, at the time of subject incident plaintiff had not received a misbehavior report in over four years. (*Id.*).[7] Plaintiff also testified that several of his past misbehavior reports were the subject of prior federal civil rights lawsuits, for which he obtained monetary settlements. (Dkt. No. 44-2 at 76-93, 262-66).

As to whether plaintiff was vindicated, it is undisputed that the November 22, 2013 misbehavior report was upheld on appeal. Although this factor works against plaintiff, such a finding is not dispositive on the issue of causal connection, but is a factor which "may" be considered in determining whether a causal connection exists between the plaintiff's protected activity and defendant Jones's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002); *see also Waters v. Melendez,* No. 15-

---

[7]Plaintiff also did not receive any further misbehavior reports between the time of the subject incident and his eventual release in 2016. (*Id.*).

18

CV-0805 (TJM/CFH), 2018 WL 3079764, at *11 (N.D.N.Y. May 18, 2018) (finding an issue of fact as to retaliation, *"even disregarding [plaintiff's] disciplinary hearing vindication,"* where the other factors as to causation weighed in plaintiff's favor and credibility issues rendered a finding of summary judgment "inappropriate") (emphasis added). Taking into consideration the temporal proximity, plaintiff's lack of disciplinary issues for over four years prior to the incident, and the statements attributed to defendant Jones which, "if true, strongly suggest that he was motivated by retaliatory intent, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, which preclude the entry of summary judgment in connection with th[is] retaliation claim." *Id.*

## B.    Defendant Smith

Plaintiff claims that defendant Smith performed a retaliatory "strip frisk" on December 11, 2013, in violation of plaintiff's First Amendment rights. Specifically, plaintiff testified that on the morning of his Tier II hearing on the misbehavior report discussed above, defendant Smith and another officer came to plaintiff's cell. (Dkt. No. 44-2 at 200-01). The officers escorted plaintiff into the hallway and, once there, had plaintiff take off his clothes. (*Id.* at 201). No inappropriate groping or intrusive touching took place. (*Id.* at 201-02). Plaintiff asked why he was being strip searched in the hallway, and defendant Smith responded " . . . your writing is pissing people off." (*Id.* at 202). Plaintiff was then permitted to put his clothes back on, and escorted to

19

another location to provide a sample for urinalysis testing.  (*Id.*).

Plaintiff argues that "there is no procedure for a strip frisk in the hallway" prior to urinalysis sampling, and that defendant Smith's motivation was to expose and embarrass plaintiff in retaliation for grievances filed against other corrections officers.  (*Id.* at 202, 205-06).  Plaintiff concedes that at the time of the incident, he had never written a grievance against defendant Smith.  (*Id.* at 205).  Defendant Smith, in a sworn declaration filed with defendants' motion for summary judgment, admits to interacting with plaintiff on December 11, 2013.  (Dkt. No. 44-9 at 2).  However, defendant Smith avers that he merely performed a pat frisk of plaintiff outside of his cell immediately prior to transporting him for urinalysis sampling, and he denies performing a strip frisk of plaintiff.  (*Id.*)

Defendants argue that plaintiff fails to raise a material issue of fact as to the adverse action and causation elements of his retaliation claim against defendant Smith. (Dkt. No. 44-16 at 13).  Even assuming, for the sake of argument, that the alleged strip frisk by defendant Smith amounted to an adverse action,[8] this court agrees that plaintiff's evidence as to causal connection is purely speculative and cannot withstand summary judgment.  As a general matter, it is difficult to establish one defendant's retaliation for

---

[8]Although courts within the Second Circuit have held that "a routine and ordinary lawful strip search" does not qualify as an adverse action (*Pizarro v. Board of Correction,* No. 16-CV-2418, 2018 WL 3462512, at *6 (S.D.N.Y. July 17, 2018)), it has also been determined that a "strip search in front of other inmates" could be unreasonable and a violation of the inmate's constitutional rights. *See Green v. Martin,* 224 F. Supp. 3d 154, 165 n. 3 (D. Conn. 2016).

complaints against another defendant. *Hare v. Hayden*, No. 09 Civ. 3135, 2011 WL

1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d

Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged

basis for retaliation was complaint about a prior incident by another corrections officer).

Plaintiff must offer "specific and detailed factual allegations" to support the assertion

that the strip frisk was a result of some retaliatory animus. *Vogelfang v. Capra,* 889 F.

Supp. 2d 489, 517 (S.D.N.Y. 2012) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85-

86 (2d Cir. 2000)).

Although plaintiff concedes that he had never written a grievance against

defendant Smith, he alleges that the subject strip search was conducted to embarrass and

humiliate plaintiff, in retaliation for his past grievances against members of the "White

Knights."[9]  However, at no time did defendant Smith tell plaintiff that defendant Smith

was a member of the White Knights, or that his reason for conducting the alleged strip

---

[9]According to plaintiff, the "White Knights" were an organization of white supremacist correctional officers at Great Meadow who "created a racist environment in the facility" and initiated physical and sexual assault on certain inmates, in addition to facilitating inmate-on-inmate violence. (*Id.* at 104-105). Plaintiff testified that he observed the White Knights' insignia, a confederate flag with "White Knights" written on it, on display at various times during his incarceration at Great Meadow. (*Id.* at 106, 109-10). The White Knights also placed racist, threatening illustrations in locations plainly visible to the inmates. (*Id.* at 107-08). Plaintiff testified that the White Knights began harassing him when he began working at the Great Meadow law library in 2013, where plaintiff was helping other inmates write and file grievances. (*Id.* at 120-21). Plaintiff spoke to other inmates who also experienced "problems" with the White Knights. (*Id.* at 111). Plaintiff maintains that the White Knights worked in a concerted effort to harass and retaliate against inmates who file complaints against other members of their group. (*Id.* at 142-43).

21

frisk was because plaintiff had written prior grievances against other members of the White Knights.  Plaintiff merely speculates that defendant Smith is a member of the White Knights, or is sympathetic toward them, because defendant Smith "constantly congregates in [the same area] with [other White Knights].  He cracks [ ] racist jokes with these guys."  (Dkt. No. 44-2 at 206).  During his deposition, plaintiff also speculated, without any support, that defendant Smith's comment that "your writing is pissing people off," was in reference to past grievances filed against defendant Jones and "other" White Knights.  (*Id.* at 202, 205-206).  Nevertheless, defendant Smith's alleged statement is not nearly "direct and specific enough to deter a prisoner from exercising his First Amendment rights." *Pizarro v. Board of Correction,* No. 16-CV-2418, 2018 WL 3462512, at *7 (S.D.N.Y. July 17, 2018) (citing *Ross,* 2012 WL 86467, at *7); *see also Kemp v. LeClaire*, No. 03-CV-844S, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (threats including "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your ... ass kicked" did not qualify as adverse actions); *Bartley v. Collins*, No. 95-CV-10161 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we [sic] going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) ("alleged statements . . . that plaintiff would 'have to pay the consequences' for filing a grievance . . . do not give rise to a First Amendment retaliation claim").

Accordingly, this court recommends granting defendants' motion for summary

22

judgment dismissing plaintiff's First Amendment retaliation claim against defendant Smith.

### C.    Defendant Alger

Plaintiff alleges that on November 20, 2013, while walking to his evening program, defendant Alger ordered him into a pat frisk position and said to plaintiff, " . . . you wrote a grievance against the White Knights nigger, now I am going to fuck you in the ass."  (Dkt. No. 44-2 at 225).  Defendant Alger then allegedly proceeded to "st[i]ck his finger in [plaintiff's] rectum,"[10] and stated something akin to "doesn't it feel good, nigger."  (*Id.* at 225, 228).  Furthermore, on January 17, 2014, at approximately 7:15 p.m., defendant Alger ordered plaintiff into a pat frisk position and "stuck his finger in plaintiff's rectum the same way," and stated, "I am going to fuck you in the ass, every Muslin nigger in the ass, who writes a grievance against the White Knights."  (*Id.* at 237-239).

With respect to plaintiff's sexual assault claim, the Second Circuit has explained that "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or

---

[10]Specifically, plaintiff testified that defendant Alger put his hand "through" plaintiff's pants, inside of his boxers.  (Dkt. No. 44-2 at 225-26).  Plaintiff further testified that defendant Alger "rammed [his finger] kind of forcefully," for approximately five seconds.  (*Id.* at 228). Plaintiff believes that defendant Alger was wearing a glove at the time.  (*Id.* at 229).

gratify the officer or humiliate the inmate." *Crawford*, 796 F. 3d at 257-58. To determine

the purpose of a correctional officer's conduct during a frisk, the Second Circuit has

looked to the timing of the frisk, the comments made during the frisk, and subsequent

comments made by the officers. *Shepherd v. Fisher*, No. 08-CV-9297, 2017 WL 666213,

at *18 (S.D.N.Y. Feb. 16, 2017) (citing *Crawford*, 796 F.3d at 258-59). Therefore, "a

single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's

Eighth Amendment rights no less than repetitive abusive conduct." *Crawford*, 796 F. 3d

at 259. Contact that does not occur during the course of "a justifiable frisk or search of

an inmate's person" is subject to greater scrutiny than contact occurring during a frisk or

search. *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 384066, at *6

(N.D.N.Y. Jan. 27, 2017); *Allah v. Morrison*, No. 14-CV-6735L, 2016 WL 4017340, at

*3 (W.D.N.Y. July 22, 2016).

Here, plaintiff alleges that he was sexually assaulted on two occasions by

defendant Alger, however defendant Alger claims that "[a]ny frisk conducted of plaintiff

was done in accordance with established DOCCS and facility procedures." (Dkt. No.

44-11 at 2). Nevertheless, even if the alleged frisks initially had penological

justification, that justification would not immunize subsequent conduct that exceeded

constitutional bounds. *See Crawford*, 796 F.3d at 257-58. The facts alleged could

support a finding that defendant Alger's conduct went beyond the contact necessary to

achieve the penological justification of the subject frisks. Furthermore, a reasonable jury

could conclude, based on defendant Alger's alleged comments, that the physical contact was undertaken for defendant Alger's own sexual gratification, to humiliate plaintiff, or both. *See Shepherd,* 2017 WL 666213, at *18.

The rule in determining whether to grant summary judgment is that credibility determinations, weighing evidence, and drawing inferences are functions for the jury, not the court. *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007) (citing *Liberty Lobby*, 477 U.S. at 255); *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matter for the jury, not for the court on summary judgment."). Although there is limited evidence supporting plaintiff's contentions, this court finds that a rational jury could find plaintiff was sexually assaulted by defendant Alger on November 20, 2013, and January 17, 2014. *See Payne v. Coburn*, No. 9:15-CV-00392 (GLS/TWD), 2017 WL 4330372, at *10 (N.D.N.Y. Aug. 29, 2017).

As to plaintiff's claim that defendant Alger sexually assaulted him in retaliation for prior grievances filed against defendant Alger[11] and other members of the White Knights, plaintiff has sufficiently raised an issue of material fact to survive summary judgment. Certainly, a reasonable juror could conclude that two incidents of sexual assault, accompanied by specific references to plaintiff's grievances, would deter a

---

[11]Plaintiff filed a prior grievance against defendant Alger on November 8, 2013, alleging that defendant Alger threatened plaintiff with physical harm and told other officers to attack "muslim Vincent" when the opportunity presented itself.  (Dkt. No. 1-1 at 82-84).

similarly situated person of ordinary firmness from engaging in future legal work. *See McCarroll v. Matteau,* No. 9:09–CV–0355 (NAM/TWD), 2012 WL 3480156, at *12 (N.D.N.Y. June 15, 2012). With respect to causal connection, the alleged sexual assaults were contemporaneous with plaintiff's prior grievances against defendant Alger and the other named defendants. Furthermore, defendant Alger's alleged comments during the assault, if credited, support a finding that defendant Alger was motivated by retaliatory animus. *See id.*

Based upon the foregoing, the court recommends that defendants' motion for summary judgment on plaintiff's Eighth and First Amendment claims against defendant Alger be denied.

### D.    Defendant Foster

Plaintiff alleges that on February 8, 2014, he was on his way to the recreation yard when he was stopped at the metal detectors by defendant Foster. (Dkt. No. 4-2 at 211-12). Defendant Foster proceeded to order plaintiff in a pat frisk position, at which time defendant Foster "grabbed [plaintiff's] buttocks" on the outside of plaintiff's clothes, and stated "I don't care how many sexual assault complaints your write, you are still going to get it in the ass." (*Id*. at 215-16).

Based on the foregoing, this court will recommend granting defendants' motion for summary judgment on plaintiff's Eighth Amendment claim against defendant Foster. Plaintiff conceded that inmates are typically pat frisked before they go into the yard, but

distinguished this incident as "more intrusive and sexual in nature." (*Id.* at 216). Nevertheless, even considering the evidence in a light most favorable to plaintiff, there is no indication that defendant Foster's actions during the pat frisk went beyond a permissible, penological purpose. Moreover, "harassment or profanity alone, unaccompanied by any [physical] injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Abreu v. Brown,* No. 6:14-CV-06599, 2018 WL 565280, at *5 (W.D.N.Y. Jan. 22, 2018), quoting *Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) (citation and internal quotation marks omitted); *see also Patton v. Przybylski*, 822 F.2d 697 (7th Cir. 1987) (determining that derogatory remarks do not constitute a constitutional violation); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (affirming the dismissal of a claim that a prison guard called plaintiff names). Plaintiff makes no allegation of any physical injury whatsoever arising out of the alleged interaction with defendant Foster, and, therefore, does not allege a violation of his Eighth Amendment rights.

As to plaintiff's retaliation claim against defendant Foster, "[s]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y.2010). *But see Pledger v. Hudson*, No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) ("Threats made to an inmate, without more, do not rise to the level of a constitutional violation.")

(citations omitted). "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo*, 682 F. Supp. 2d at 435. *See also Hofelich v. Ercole*, No. 06 Civ. 13697, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) ("[C]ase law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered.").

Nevertheless, even assuming defendant Foster's verbal threats constituted an adverse action, plaintiff has not raised a material question of fact with respect to causation. Plaintiff alleges that defendant Foster threatened him in retaliation for grievances filed against defendant Foster and other corrections officers in the "White Knights." (Dkt. No. 44-2 at 214-15). Plaintiff, however, has not identified any prior grievances specifically filed against defendant Foster. (*Id.*). Furthermore, plaintiff's claim that defendant Foster is a member of the "White Knights," on whose behalf he allegedly sought retaliation, is based on pure speculation.[12] Plaintiff has provided no evidence establishing why Foster would threaten plaintiff on the other defendants' behalf, beyond a conclusory belief that the officers are "sympathetic" to each other. As such, he has failed to present a genuine issue of material fact as to a causal connection

---

[12]"He is with the White Knights officers . . . I had every reason to believe that he was one of them. The other officers that [weren't] part of the organization, they weren't harassing me. They [weren't] coming to me, messing with me or nothing. Obviously, again, he is a member, or he is sympathetic to what they are doing. There were plenty of officers in there who said nothing to me, had nothing to say to me or didn't harass me or anything." (Dkt. No. 44-2 at 210-11).

between his protected speech and defendant Foster's alleged conduct. See *Ciaprazi v. Goord*, No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); *see also Alicea v. Maly*, No. 9:12–CV–203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); *Guillory v. Ellis*, No. 9:11–CV–600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug.29, 2014).

Accordingly, this court recommends granting defendants' motion for summary judgment of plaintiff's First and Eighth Amendment claims against defendant Foster.

### E.    Defendant Garrido

Plaintiff further alleges that on January 23, 2014, at a previously-identified metal detector leading out to the recreation yard, defendant Alger ordered defendant Garrido to search plaintiff, stating "make sure [plaintiff] get[s] fucked in the ass." (Dkt. No. 44-2 at 250-52). Plaintiff then "got on the wall," and defendant Garrido initiated a pat-frisk of plaintiff, during which he put his hand down plaintiff's pants and placed his hand and finger inside plaintiff's rectum. (Dkt. No. 44-2 at 249-50). Defendant Garrido denies ever having assaulted, harassed, or threatened plaintiff. (Dkt. No. 44-13 at 2).

Defendant Garrido's alleged conduct sufficiently forms the basis for an Eighth Amendment violation. As stated above, even a "single incident of sexual abuse, if sufficiently severe or serious, may violate" the inmate's rights. *Crawford*, 796 F.3d at

257. The court must determine"whether the contact is incidental to legitimate official duties, such as a justifiable pat-frisk or strip search, or by contrast whether it was taken to arouse or gratify the officer or humiliate the inmate," *Id.* (citing *Whitley v. Albers*, 475 U.S. 312 (1986)).  Assuming the veracity of plaintiff's allegations, especially in light of the alleged encouragement and direction by defendant Alger to "make sure [plaintiff] get[s] fucked in the ass," a jury could find that defendant Garrido's conduct was not a good faith effort to maintain or restore discipline.  *See Hayes v. Dahnkle,* No. 9:16-CV-1368 (TJM/CFH), 2018 WL 7356343, at *11 (N.D.N.Y. Dec. 11, 2018) (citing *Whitley*, 475 U.S. at 320).

With respect to the causal connection between plaintiff's protected grievance writing and the alleged sexual abuse, plaintiff concedes that he had never filed a grievance against defendant Garrido before this incident.  (Dkt. No. 44-2 at 251).  However, unlike his allegations against defendant Foster, plaintiff testified that defendant Alger and defendant Garrido made specific references to plaintiff's written complaints against the White Knights during the January 23, 2014 alleged assault.  (*Id.* at 255).  Given the defendants' alleged statements regarding their motivation, in conjunction with the temporal proximity of defendant Garrido's alleged assault with plaintiff's past grievance made against defendant Alger, summary judgment is not appropriate.  *See Henderson v. Vanderwerff,* No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *5 (N.D.N.Y. Feb. 18, 2016); *Vega v. Artus*, 610 F. Supp. 2d 185, 208

30

(N.D.N.Y. 2009) (holding that direct statements made by the defendant indicating his retaliatory motive were sufficient evidence of retaliation); *Espinal*, 558 F.3d at 129 (finding that temporal proximity is established where the adverse action occurred six months after the protected conduct).

### F.    Defendant Underwood

Plaintiff alleges that defendant Underwood was present for and witnessed the January 23, 2014 assault by defendant Garrido, committed at the direction of defendant Alger.  (Dkt. No. 44-2 at 252-53).  During the assault, plaintiff alleges defendant Underwood stated, "We get away with murder, no need of complaining."  (*Id.*).  Plaintiff further testified at his deposition that defendant Underwood "stood by [and] watched 'it' occur, and didn't do anything."  (*Id.* at 253).  Defendant Underwood never touched plaintiff.  (*Id.*).

"[A] corrections officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate in the use of force."  *Payne v. Coburn,* No. 9:15-CV-00392 (GLS/TWD), 2017 WL 4330372, at *5 (N.D.N.Y. Aug. 29, 2017) (citing *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May 24, 2010)); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010).  Indeed, an official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Cicio*,

2010 WL 980272, at *13. In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Tafari*, 714 F. Supp. 2d at 342; *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).  Mere inattention or inadvertence does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *Cicio,* 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) ("liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (other citations omitted)).

Based on the record before the court, a question of material fact remains as to whether defendant Underwood can be held liable under the Eighth Amendment for failure to intervene.  Plaintiff's testimony that defendant Underwood not only stood by and watched the incident take place, but that he further acknowledged and encouraged the assault by his contemporaneous comment that they "get away with murder," constitutes more than mere inattention to the alleged excessive force, and may establish that defendant Underwood knew that the assault was taking place and intentionally refused to take reasonable measures to end the assault.  *See Jean-Laurent*, 540 F. Supp. at 501 (denying summary judgment on failure to intervene claim where there remained

an issue of material fact as to whether a reasonable person in the defendant officers' position would know that plaintiff's constitutional rights were being violated).

Plaintiff also asserts a First Amendment claim against defendant Underwood, alleging that his failure to intervene was in retaliation for prior grievances filed against the White Knights. Based on the facts as alleged, this court recommends denying defendants' motion on this claim.  As to the issue of adverse action, whether defendant Underwood's "inaction" and encouragement of the alleged sexual assault would make a person of "ordinary firmness" disinclined to exercise his right to grieve within the DOCCS system is a question of fact for the jury.  *See Vincent v. Sitnewski,* 117 F. Supp. 3d. 329, 339 (S.D.N.Y. 2015).  The same can be said on the issue of causation – any credibility determination as to whether defendant Underwood made specific remarks about plaintiff's grievances, in the company of defendant Alger and defendant Garrido, in the course of observing defendant Garrido's sexual assault on plaintiff, is the province of the jury.  *Id.*

### G.   Qualified Immunity

Defendants also argue that they are entitled to qualified immunity on all claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As to plaintiff's claims against defendant Smith and defendant Foster, I am

recommending dismissal based on the merits and as such need not determine whether qualified immunity applies. With respect to plaintiff's surviving First and Eighth Amendment claims against defendants Jones, Alger, Garrido, and Underwood, for the reasons set forth below I would recommend denying defendants' motion for summary judgment based on qualified immunity.

With respect to plaintiff's Eighth Amendment claims against defendants Alger and Garrido, defendants argue that the alleged sexual assaults "were not clearly unconstitutional at the time of the alleged events." (Dkt. No. 44-16 at 21-22). This court disagrees. Admittedly, the events in question took place prior to the Second Circuit's 2015 decision in *Crawford*; however the defendants' alleged conduct clearly rose above mere verbal harassment, touching or pressing against without plaintiff's consent, and as such would not be considered "objectively reasonable" even under the heightened *Boddie* standard. *See Shepherd,* 2017 WL 666213 at *18 (discussing heightened *Boddie* standard that alleged sexual assault must reach a high level of severity, such as direct contact with uncovered genitalia, physical injury, or *penetration* to implicate the Constitution.) (emphasis added).

Furthermore, defendant Underwood is not entitled to qualified immunity with respect to plaintiff's failure to intervene claim. *See Allen v. City of New York*, 480 F. Supp. 2d 689, 696 (S.D.N.Y. 2007) ("[A] reasonable juror could find that [defendants'] failure to intervene [while plaintiff was being assaulted] permitted [the assaulting

34

officer] to violate [plaintiff's] established rights of which a reasonable officer would have been aware and that this failure to intervene was objectively unreasonable. Therefore, [defendants] are not entitled to qualified immunity.") (citing *Sims v. Griener*, No. 00 Civ. 2524, 2001 WL 1142189, at *6 (S.D.N.Y. Sept. 27, 2001) (denying qualified immunity to corrections officer alleged to have witnessed an attack on inmate)).

With respect to plaintiff's retaliation claims, the Second Circuit has expressed some doubt about the applicability of qualified immunity defenses to First Amendment retaliation claims. *See Washington v. Gonyea*, 538 F. App'x 23, 27 (2d Cir. 2001). Such claims, the Second Circuit reasoned, explicitly require an improper retaliatory motive on the part of the defendant, and "where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Id.* (quoting *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001) (noting that "a plaintiff need only show particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive in order to survive a motion for summary judgment on the defense of qualified immunity."); see also *Torres v. LaLota*, No. 15-CV-157097, 2017 WL 4457514, at *9 (E.D.N.Y. Aug. 14, 2017).

   **WHEREFORE**, based on the findings above, it is

   **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 44) be **GRANTED** with respect to all claims against defendants Smith and Foster, and it is

further

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 44)

be **DENIED** with respect to all claims against defendants Jones, Alger, Garrido and

Underwood.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: June 21, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge